UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Tina Marie Howland,                                    Civil No. 10-5 (JRT/FLN)

      Plaintiff,

      v.                                                    **REPORT AND
                                                        RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

      Defendant.
_____

Michael J. Riley for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for Defendant.
_____

Plaintiff Tina Marie Howland seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner"), who denied her application for disability

insurance benefits ("DIB"). *See* 42 U.S.C. §1382(c). The matter was referred to the undersigned

United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and

Local Rule 72.1. This Court has jurisdiction over the claim pursuant to 42 U.S.C. § 405(g). The

parties have submitted cross-motions for summary judgment. (ECF Nos. 6, 9.) For the reasons

which follow, it is this Court's recommendation that the Commissioner's decision be

**REVERSED** and the case be **REMANDED.**

## I.      INTRODUCTION

Ms. Howland filed a claim for DIB on August 29, 2006, claiming she had been disabled

since September 1, 2005. (ECF No. 4, Administrative Record [hereinafter "R."] 95-99.) Her

alleged impairments include multiple sclerosis, severe fatigue, weakness in her limbs, depression

and anxiety. (R. 10, 132.) The Social Security Administration ("SSA") initially denied her

application on January 4, 2007, and again upon reconsideration on April 24, 2007. (R. 44-45, 48-53, 56-61.) Ms. Howland timely filed a request for a hearing, which was held before Administrative Law Judge ("ALJ") William Brown on March 10, 2009. (R. 245-98.) On April 23, 2009, the ALJ issued his findings and concluded that Ms. Howland was not disabled within the meaning of the Social Security Act. (R. at 52-55.) On November 24, 2009, the Appeals Council denied Ms. Howland's request for review (R. 1), making the ALJ's decision final for purposes of judicial review. *See* 20 C.F.R. § 404.981. Ms. Howland commenced this civil action on January 4, 2010 seeking review of the Commissioner's decision. (ECF No. 1.) The Commissioner answered on March 22, 2010, and both parties have submitted cross-motions for summary judgment. (ECF Nos. 3, 6, 9.)

## II.     STATEMENT OF FACTS

### A.     Background

Ms. Howland was born on August 11, 1975. (R. 25, 44-45, 95.)  She was 30 years old at the alleged onset of her disability on September 1, 2005, and 33 years old at the time of the hearing in March 2009. (R. 25, 127, 95.) Ms. Howland has a high school education. (R. 26, 137.) She served in the military from 1993 to 2001. (R. 26.) Between 1994 and 2006, she worked seven different jobs, including positions as a bank teller in 1997, as a hardware store cashier from July 2002 to September 2003, as a phone operator from October 2003 to March 2004, as a motel desk clerk from March 2004 to July 2004, and as a child care assistant from August 2004 to March 2006. (R. 27, 164-72.) Due to her medical conditions, Ms. Howland quit her last job as a child care assistant on March 19, 2006. (R. 27.) On August 29, 2006, she filed for DIB, claiming disability status since September 1, 2005.  (R. 95-99.)

**B.     Medical Evidence**

Ms. Howland was diagnosed with multiple sclerosis ("MS") in 1999. (R. 239, 257.) Over time, she has developed several exacerbations of her MS symptoms. (R. 257.) Ms. Howland also has a history of anxiety and depression. (R. 266.)

**1.     Physical Impairment**

**a.     Treating Physician**

Ms. Howland has been under the care of Dr. Allan Ingenito since October 2004. (R. 265.) Dr. Ingenito saw Ms. Howland on multiple occasions thereafter. (R. 265-68, 270-96, 404-43.)

In his report dated October 13, 2004, Dr. Ingenito noted that Ms. Howland was experiencing symptoms including fatigue, intermittent paresthesias, visual disturbances and bladder dysfunction. (R. 268.) Ms. Howland reported "decreased energy level with frequent naps," and being fatigued "after walking from one room to the next." (R. 265.) Ms. Howland's neurologic examination demonstrated "right dorsiflexion weakness," mildly decreased sensation in her right foot to ankle, and mild difficulty with tandem walking. (R. 267.) Dr. Ingenito also noted that Ms. Howland's July 2004 MRI scans revealed "moderate, stable T1 lesion burden, moderate to severe T2 burden with no new lesions." (R. 267.) He further observed that "a few of the larger lesions demonstrated on [Ms. Howland's] previous exam have diminished in size." (R. 267.) Dr. Ingenito indicated that he would continue to treat Ms. Howland's MS with Rebif. (R. 268.)

On April 5, 2005, Dr. Ingenito noted Ms. Howland was "again experiencing numerous symptoms," including fatigue, weakness, visual disturbances, difficulty swallowing and bladder dysfunction marked by urinary retention. (R. 264.) Ms. Howland complained of "intermittent

numbness in her feet bilaterally, with persistent paresthesias in her right toes." (R. 261.) Ms. Howland also reported "more fatigue," and "trouble falling asleep." (R. 261.) Ms. Howland's neurologic examination was otherwise the same as her last examination except that she additionally demonstrated mildly decreased sensation in her right foot to ankle, and first and second toes. (R. 263.)

On March 29, 2006, Ms. Howland sought treatment from Dr. Ingenito again. (R. 257.) Earlier that month, Ms. Howland presented with symptoms of "numbness in the right leg, gait changes, dizziness, and fatigue." (R. 257.) Dr. Ingenito also noted that she had "occasional episodes of blurred vision, scotomas, and horizontal double vision." (R. 257.) Over the course of two weeks in March, Dr. Ingenito treated Ms. Howland with two three-day courses of IV Decadron and Medrol Dosepak. (R. 257.) Ms. Howland experienced "a few days of symptom relief" after the treatment. (R. 257.) On March 29, 2006, Dr. Ingenito nevertheless determined that the symptoms "returned with no improvement" when Ms. Howland returned to work as a child care assistant. (R. 257.) Dr. Ingenito noted that Ms. Howland was "unable to work," and "may pursue disability." (R. 257, 259-60.) Ms. Howland's neurologic examination demonstrated that she had mild right dorsiflexion weakness, decreased mild sensation in her right leg below the knee, and mild difficulty with tandem walking; she also walked with a limp, favoring the right leg. (R. 259.) Ms. Howland's MRI scans showed subtle enhancement in the mid pons, and an enhancing lesion at T7-8. (R. 259.) In addition, Ms. Howland also reported frequent daily headaches, however, they were not associated with nausea, photophobia, or hyperacusis. (R. 260.) Dr. Ingenito opined that her headaches may improve as "her physical and emotional stress diminishes." (R. 260.)

On May 5, 2006, Dr. Ingenito examined Ms. Howland again. Dr. Ingenito noted that Ms. Howland's MS symptoms had significantly improved after she stopped working in March of 2006. (R. 280.) Still, Ms. Howland continued to have occasional scotomas and suffered from severe headaches every two days, now associated with nausea, photophobia, and hyperacusis. (R. 280—81.) Ms. Howland's neurologic examination demonstrated that her strength, tone and bulk were normal in both the upper and lower extremities. (R. 282.) Her sensation and gait had also improved. (R. 282.) Still, Dr. Ingenito opined that Ms. Howland's gait had not completely returned to baseline as she occasionally stumbled although she had not fallen. (R. 280.)

Ms. Howland returned to Dr. Ingenito for treatment on August 3, 2006. She reported the onset of gait disturbance, blurred vision, generalized fatigue, and mild difficulty swallowing as well as persistent numbness in her feet bilaterally. (R. 276.) Ms. Howland also suffered from tinnitus and slurred speech. (R. 276.) Dr. Ingenito found that Ms. Howland was again experiencing exacerbation of her MS symptoms, including symptoms of fatigue, weakness, visual disturbances, and difficulty swallowing. (R. 278.) Ms. Howland's neurologic examination demonstrated that she had mild right dorsiflexion weakness in her foot, decreased mild sensation in her medial right foot to ankle and first and second toes, and mild difficulty with tandem walking. (R. 278.)

During her next visit on August 11, 2006, Dr. Ingenito noted that Ms. Howland continued to have occasional symptoms including right arm pain, difficulty swallowing, and visual scotomas. (R. 273.) Ms. Howland's neurologic examination did not show any impairments of right dorsiflexion weakness in her foot, mild sensation in her medial right foot to ankle and first and second toes, or mild difficulty with tandem walking as in her examination on August 3,

2006, but nevertheless showed diminished sensation in her right arm between the wrist and shoulder. (R. 273.)

On November 16, 2006, Ms. Howland returned to Dr. Ingenito "on a semi-emergent basis." (R. 440.) Ms. Howland reported a heavy sensation in her left leg and difficulty walking. (R. 440.) Dr. Ingenito determined that Ms. Howland presented with symptom exacerbation, affecting primarily her left leg. (R. 443.) She was also experiencing "paresthesias and dysesthesias throughout the leg and foot," "difficulty walking" and "tingling in the big toe of the right foot." (R. 440.) In addition, Ms. Howland's lower back felt numb to the touch without pain or radiating symptoms. (R. 440.) Dr. Ingenito noted that Ms. Howland had "increasing reflexes, decreasing pin sensation, and decreasing strength in the left leg." (R. 443.) Specifically, Ms. Howland's neurologic examination demonstrated diminished strength in her left leg with hip flexion, knee extension and dorsiflexion, and diminished sensation in her left leg below the knee. (R. 442.) Ms. Howland walked with a limp, favoring her left leg, and performed toe, heel and tandem walking "with difficulty[,] with significant imbalance and shaking." (R. 442.)

On January 12, 2007, Dr. Ingenito found that Ms. Howland's MS symptom exacerbation had improved since November 2006, following a course of IV and oral steroids treatment. (R. 439.) Ms. Howland, however, reported new symptoms including paresthesias and weakness in her left hand and left leg. (R. 439.) Her neurologic examination demonstrated diminished strength in her left leg with hip flexion, knee extension and dorsiflexion, diminished strength in her left wrist extension, diminished sensation in her entire left leg and left hand, and mild difficulty with toe, heel and tandem walking. (R. 442.) She also reported having more frequent headaches. (R. 439.) Due to her symptom flare-ups, Dr. Ingenito decided to explore additional

therapeutic options for Ms. Howland. (R. 439.) On February 15, 2007, Dr. Ingenito opted to start Ms. Howland on Cellcept. (R. 435.)

On June 7, 2007, Dr. Ingenito noted a recent onset of gait disturbance, blurred vision, generalized fatigue, mild difficulty swallowing, and persistent numbness in Ms. Howland's feet bilaterally. (R. 429.) Her neurologic examination demonstrated dorsiflexion weakness in her right foot, hyperactive but symmetric reflexes, mildly diminished sensation in her medial right foot, and mild difficulty with tandem walking. (R. 431.) At this visit, her gait was otherwise normal, including toe and heel walking. (R. 431.)

MRI scans performed in September 2007 demonstrated "moderate T1 and T2 lesion burden with 2 new small lesions and stable volume loss with mild generalized cerebral atrophy and minimal callosal volume loss," as well as "a single new left sided cord lesion at C2, with diffuse old stable demyelination in the cervical and upper thoracic spinal cord." (R. 416.)

At another visit with Dr. Ingenito on April 18, 2008, Ms. Howland reported paresthesias involving her left arm, radiating from the shoulder to the forearm, and in her feet constantly. (R. 415.) Ms. Howland also complained that the leg and foot paresthesias were exacerbated by exercise. (R. 415.) A neurologic examination demonstrated right dorsiflexion weakness in her foot, hyperactive but symmetric deep tendon reflexes, mildly decreased sensation in her medial right foot to ankle and first and second toes. (R. 417.) Except mild difficulty with tandem walking, her gait was normal, including toe and heel walking. (R. 417.)

On June 16, 2008, Ms. Howland saw Dr. Ingenito again. Dr. Ingenito noted that Ms. Howland's had "experienced several clinical exacerbations, including symptoms of fatigue, weakness, visual disturbances and difficulty swallowing." (R. 410.) Ms. Howland's neurologic

examination demonstrated the same symptoms as her previous examination on April 18, 2008. (R. 410.)

On September 18, 2008, Ms. Howland saw Dr. Ingenito "on an emergent basis." (R. 404.) Ms. Howland complained of a recent onset of painful left upper extremity dysesthesias, incoordination and weakness. (R. 404.) Dr. Ingenito determined that her left arm symptoms were "characteristically different than any mild paresthesias of the arm she ha[d] experienced in the past." (R. 404.) Ms. Howland reported mood changes and recent emotional stresses related to her mother's diagnosis with breast cancer and chemotherapy treatments. (R. 404.) Ms. Howland's neurologic examination demonstrated weakness in her left upper extremity, particularly prominent in the deltoid, triceps, hand grasps and finger strength, right dorsiflexion in her foot, and hyperactive but symmetric deep tendon reflexes. (R. 406.) The examination also revealed mildly decreased sensation in her medial right foot to ankle, first and second toes, and on the lateral aspect of her left leg L5 distribution. (R. 406.) Ms. Howland also showed incoordination of the left upper extremity. (R. 406.) Except mild difficulty with tandem walking, her gait was normal, including toe and heel walking. (R. 399.)

On October 28, 2008, Ms. Howland reported that her multiple clinical symptoms "have been worse recently." (R. 396.) Dr. Ingenito determined that Ms. Howland was experiencing "multiple functional difficulties, with [an] increase in left upper extremity sensory symptoms and incoordination, bladder dysfunction, and increased myoclonus." (R. 400.) In reviewing Ms. Howland's MS history, Dr. Ingenito noted that Ms. Howland's symptom exacerbation often occurs "when she is under great deal of stress." (R. 399.) Her neurologic examination demonstrated weakness in her left upper extremity, particularly prominent in the hand grasps and finger strength, as well as right dorsiflexion in her foot. (R. 399.) The examination also revealed

mildly decreased sensation in her medial right foot to ankle, first and second toes and legs bilaterally from the knees distally. (R. 399.) Ms. Howland also reported "bilateral diminished sensation to pin on her mid to lower back, and on her arms bilaterally, with increased sensation to pin from her wrists distally." (R. 399.) Except mild difficulty with tandem walking, Ms. Howland's gait was normal, including toe and heel walking. (R. 399.)

In his last report, dated December 30, 2008, Dr. Intengito determined that Ms. Howland experienced "increased fatigue, generalized weakness and fatigability." (R. 392.) Ms. Howland also complained about "intermittent paresthesias involving her left arm and her foot." (R. 392.) Dr. Ingenito noted that Ms. Howland had developed "mild lipodystropy in her thigh." (R. 392.) A neurologic examination demonstrated right dorsiflexion weakness in her foot, hyperactive but symmetric deep tendon reflexes, mildly decreased sensation in her medial right foot to her ankle, and first and second toes. (R. 394.) Except mild difficulty with tandem walking, her gait was normal, including toe and heel walking. (R. 394.)

**b.      State Agency Physicians**

On November 30, 3006, Dr. Charles Grant, a State agency physician, conducted a residual functional capacity ("RFC") assessment for Ms. Howland. (R. 324.) After reviewing the medical record, Dr. Grant opined that Ms. Howland was then "stable on Rebif." (R. 318.) Dr. Grant also noted that the symptoms alleged by Ms. Howland were "credible." (R. 322.) Dr. Grant concluded that Ms. Howland's neurological exam on August 11, 2006 was "unremarkable." (R. 318.) Finally, Dr. Grant opined that Ms. Howland's extertional limitations included lifting twenty pounds occasionally and ten pounds frequently, standing and/or walking for six hours in an eight-hour workday, sitting for six hours in an eight-hour workday, and unlimited pushing

and/or pulling, including operation of hand and foot controls. (R. 318.) Dr. Grant concluded that Ms. Howland was not disabled through the date of determination. (R. 44.)

On April 23, 2007, Dr. Benjamin Blackman, another State agency physician, reviewed the medical evidence and affirmed Ms. Howland was not disabled through the date of determination. (R. 45.)

### 2. Mental Impairment

There is nothing in the record to suggest that Ms. Howland has been treated by a mental health professional; nevertheless she has a history of anxiety and depression (R. 265, 299, 393) and has a secondary diagnosis of affective mood disorder. (R. 44, 45.) Ms. Howland has used medications for anxiety. (R. 264.) In his first consultation with Ms. Howland on October 13, 2004, Dr. Ingenito acknowledged Ms. Howland's "history of anxiety and depression" and noted that "Xanax p.r.n. is very helpful in relieving her anxiety." (R. 266.) Because Ms. Howland experienced increasing symptoms of anxiety and depression, Dr. Ingenito prescribed Cymbalta for treatment of both pain and depression beginning in August 2006. (R. 408, 411.) During her visit on December 30, 2008, the last visit in the record, Dr. Ingenito noted that Ms. Howland experienced a "marked exacerbation of anxiety." (R. 395.) Dr. Ingenito opted not to employ further intervention, but continued Ms. Howland's treatment with Xanax and Cymbalta. (R. 395.) Dr. Ingenito further noted that psychiatric consultation would be considered in the future depending upon Ms. Howland's clinical response. (R. 395.)

Moreover, in many of his medical notes, Dr. Ingenito has opined that Ms. Howland's anxiety contributes to the exacerbation of her MS symptoms. (R. 274, 293, 397, 442.) Dr. Ingenito noted a correlation between MS flare-ups and stress in Ms. Howland's life, such as working and dealing with her mother's illness. (R. 393, 397.) On December 30, 2008, Dr.

Ingenito found that Ms. Howland continued to demonstrate intermittent decreased mood and abulia. (R. 393.) He associated a marked increase in Ms. Howland's anxiety with her husband's son moving in with them. (R. 393.)

On November 27, 2006, Jean Rafferty, Psy. D., a State agency psychologist, examined Ms. Howland. (R. 299.) During the interview, Ms. Howland admitted suffering from depression and anxiety when she has MS flare-ups. (R. 300.) She stated that she was otherwise cheerful and had only one panic attack, and she denied feeling hopeless and helpless. (R. 299.) Dr. Rafferty noted that her gait appeared to be balanced and coordinated, and that there were no indications that she experienced hallucinations, delusions, paranoid ideation, or loose associations. (R. 299-300.) Dr. Rafferty nevertheless found that Ms. Howland had a short-term attention span and poor memory skills. (R. 300-01.) Ms. Howland could "only recall one out of three unrelated words after ten minutes." (R. 300.) Dr. Rafferty further noted that Ms. Howland was not clinically depressed or anxious. (R. 301.) Dr. Rafferty concluded that Ms. Howland was not compromised in her ability to understand instructions but her concentration skills were impaired. (R. 301.) Specifically, "carrying out tasks with reasonable persistence and pace would be very difficult" for Ms. Howland "due to her concentration problems and her level of fatigue." (R. 301.) Although Ms. Howland had appropriate responsiveness with co-workers and supervisors, Dr. Rafferty did not believe that she could manage the stress of employment. (R. 301.)

On January 2, 2007, Joelle Larsen, Ph.D., another State agency psychologist, reviewed the medical evidence and found that Ms. Howland's mental impairment was "not severe." (R. 325.) Dr. Larsen diagnosed Ms. Howland with an adjustment disorder with depression and anxiety due to MS flare-ups and concluded that Ms. Howland's attention and concentration were mildly impaired. (R. 225, 337.) Dr. Larsen noted that Ms. Howland's daily activities were

primarily limited by physical issues. (R. 337.) Nevertheless, Ms. Howland is social and able to get along with others, and she has a long work history which ended secondary to physical issues. (R. 337.) Dr. Larsen further noted that Ms. Howland was not under any psychological treatment. (R. 337.) Dr. Larsen gave no weight to Dr. Rafferty's medical opinion, finding it to be "not consistent with other information in [the] file." (R. 337.) Dr. Larsen determined instead that Ms. Howland "appear[ed] to have the cognitive and concentration abilities necessary to complete tasks." (R. 337.) Dr. Larsen concluded that Ms. Howland's medically determinable impairment did not satisfy the affective disorder criteria for Listing 12.04 of 20 C.F.R., Part 404, Subpart P, Appendix 1. (R. 325, 328.)

### C.    Plaintiff's Testimony

At the administrative hearing on March 10, 2009 before ALJ William G. Brown, Ms. Howland testified regarding her impairments, conditions and daily life. (R. 25-34.) She claimed disability beginning on September 1, 2005, the date on which she began to have "more flare-ups with [her] MS." (R. 28.) She also testified that, in March of 2006, she left her part-time job as a child care assistant "because of [her] MS" and frequent absences related thereto. (R. 27.)

In describing the numbness in her hands and fingers, Ms. Howland described that she had a "hard time holding onto things," and "dropped a few things" in recent months. (R. 28.) Her arm weakness also prevented her from holding anything heavy. (R. 31.) Ms. Howland further testified that the numbness in her legs has affected her ability to stand and walk. (R. 31.) In describing her anxiety, Ms. Howland testified that she had "panic attacks" and felt "stressed out" by "simple things, normal everyday things." (R. 32.)

Ms. Howland testified that she cooks, takes her dog out, and reads. (R. 28.) She does not go shopping by herself because she has a hard time walking and does not feel comfortable

driving. (R. 33.) She does not engage in outside work like gardening, or any hobbies or sports. (R. 29.) She exercises "every couple of days" with a walk tape at home. (R. 33.) This exercise includes controlling her arms, and moving her arms and legs at the same time. (R. 33.) Ms. Howland stated that, after exercising, she is "so tired" and needs to lie down. (R. 32-33.)

D.     **Medical Expert's Testimony**

Dr. Andrew M. Steiner testified at the March 10, 2009 administrative hearing as a medical expert. (R. 34-38.) Dr. Steiner acknowledged that he did not have sufficient time to review the entirety of the exhibit comprising Ms. Howland's medical records (dated from November 16, 2006 to December 30, 2008). (R. 36.) Based on his limited review, Dr. Steiner testified that Ms. Howland's symptoms of numbness, weakness and fatigue, and "some incoordination" are attributable to MS as early as 1999 and thereafter. (R. 35.) His summary of Ms. Howland's physical impairments included "weakness in the left upper extremity to the extent not less than antigravity strength," "weakness in dorsiflexion of the right foot requiring no bracing," and a "mild decrease in sensation in the foot, ankle and legs." (R. 35.) He testified that the documented physical findings also demonstrated thoracic spinal cord atrophy, urinary retention problems, and adjustment disorder with emotional features. (R. 35-36.) Dr. Steiner noted that the record nevertheless did not include any "actual measurement of fatigue," nor did it document any problems with Ms. Howland's upper extremity use with respect to fine manipulation or firm gripping. (R. 35.) Dr. Steiner conceded, however, that anxiety can aggravate MS symptoms.  (R. 37.)

Dr. Steiner ultimately concluded that Ms. Howland did not meet or equal any of the listings for MS. (20 C.F.R. Part 404, Subpart P, App. 1; R. 38.) Specifically, Dr. Steiner stated that the Ms. Howland's symptoms did not rise to the level of "disorganization of motor function

in two extremities," "visual or mental impairment," or "significant reproducible fatigue of motor function" as required by Listing 11.09. (20 C.F.R. Part 404, Subpart P, App. 1, Listing 11.09; R. 37-38.)

Dr. Steiner further testified to Ms. Howland's exertional limits, stating that she would be precluded from climbing, working at heights or with hazardous machinery, and balancing on ropes, ladders and scaffolds. (R. 36.) Dr. Steiner limited her RFC to occasional firm power gripping, frequent but not continuous fine manipulation, and occasional foot pedal activities. (R. 36.)

### E.     Vocational Expert's Testimony

Wayne Onkin testified as a vocational expert at the hearing. (R. 37.) The ALJ posed two hypothetical questions for Mr. Onkin to consider. (R. 39-40.)

The ALJ first asked Mr. Onkin to consider a person of Ms. Howland's age, education and work experience who is impaired with MS, anxiety and an adjustment disorder. (R. 39.) This person is limited to lifting ten pounds occasionally, five pounds frequently, and can stand or walk for two hours and sit for six hours during an eight-hour day. (R. 39.) This person cannot do work at heights or around hazards, or work that requires climbing ropes, ladders or scaffolds. (R. 39.) This person could engage in no more than occasional power gripping or grasping, as well as no more than frequent fine manipulation or occasional use of foot pedals. (R. 39.) This person could perform semiskilled or unskilled work. (R. 39-40.) Mr. Onkin concluded that a person with these hypothetical limitations could perform Ms. Howland's past work as a sedentary receptionist. (R. 40.) Moreover, Mr. Onkin stated that there are over 5,000 sedentary receptionist jobs in the state of Minnesota. (R. 40.) Besides receptionist, Mr. Onkin also listed other sedentary unskilled jobs available in the regional or national economy, including surveillance

system monitor (of which there are 1,000 jobs available), telemarketer (of which there are 2,000 jobs available), and document preparer (of which there are 500 jobs available). (R. 40.)

Mr. Onkin further testified, however, that a person with these limitations would not be employable if her anxiety and stress level would "cause her to miss more than two days of work in a month." (R. 40-41.)

The ALJ then asked Mr. Onkin to consider the hypothetical person in the first question with the further limitation that this person could not maintain the concentration, persistence and pace necessary for competitive employment. (R. 40, 41.) Mr. Onkin testified that there is no job in the regional or national economy for such a person. (R. 41.)

**F.       The ALJ's Decision**

In determining whether or not Ms. Howland was disabled, the ALJ followed a five-step sequential process outlined at 20 C.F.R. § 404.1520. At the first step of the analysis, the ALJ determined that Ms. Howland had not engaged in substantial gainful activity since the alleged onset date of her disability, September 1, 2005. (R. 10.)

The second step in the sequential evaluation is to determine whether Ms. Howland had a severe impairment, defined as a medically determinable impairment or combination of impairments that significantly limits her individual's physical or mental ability to do basic work activities. (R. 14-15.) The ALJ concluded that Ms. Howland's severe impairments consisted of MS, an adjustment disorder and anxiety. (R. 14-15.)

The third step in the analysis requires a comparison of the claimant's severe impairments with the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1, Listing of Impairments. The ALJ did not expressly rule on whether Ms. Howland's MS symptoms satisfied the MS listings under 11.09. (R. 15-16.) The ALJ instead analyzed Ms. Howland's mental impairments

pursuant to listings 12.04 and 12.06. (R. 15; 20 C.F.R. § 404, Subpart P, Appendix 1, Listings 12.04, 12.06.) The ALJ concluded that Ms. Howland's mental impairments, alone or in combination, were not severe enough to meet or medically equal the criteria of Listings 12.04 and 12.06. (R. 15-16; 20 C.F.R. § 404, Subpart P, Appendix 1, Listings 12.04, 12.06.)

The last two steps in the evaluation require the ALJ to determine whether the claimant despite her impairments, has the RFC to perform her past relevant work or any other work existing in significant numbers in the national economy. (R. 16-18; 20 C.F.R. § 404.1565.) In determining Ms. Howland's RFC, the ALJ considered the medical record, Ms. Howland's testimony, the medical expert's testimony, the vocational expert's testimony, and the credibility of Ms. Howland's subjective complaints. (R. 16.) The ALJ concluded that Ms. Howland has the following RFC: she can perform sedentary work as defined by 20 C.F.R. § 404.1567(a), except the work should require no use of ropes, ladders or scaffolds, no more than occasional power gripping or grasping, no more than frequent fine manipulation, and no more than occasional use of foot pedals; and the work should be limited to semi-skilled or unskilled work. (R. 15-16.)

In making the RFC determination, the ALJ placed significant weight on the medical expert's testimony, stating that his testimony was "consistent with the record as a whole." (R. 17.) Dr. Steiner testified that Ms. Howland would be precluded from climbing, working at heights or with hazardous machinery, and balancing on ropes, ladders and scaffolds, and limited her RFC to occasional firm power gripping, frequent but not continuous fine manipulation, and occasional foot pedal activities. (R. 36.) The ALJ also placed significant weight on the opinions of the State agency physicians, who opined that Ms. Howland "could lift and carry as much as twenty pounds occasionally and ten pounds frequently" and that she "could stand and/or walk for up to six hours in an eight-hour work day." (R. 17.)

The ALJ rejected the opinion of Jean Rafferty, Psy. D. (*See* R. 17.) Noting that Ms. Howland had engaged in some work activity since the alleged onset of her disability, the ALJ concluded that Dr. Rafferty's opinion that Ms. Howland could not manage the stress of employment was "contradicted by the record." (R. 17.) The ALJ further determined that Ms. Howland's work activity after the alleged onset date indicated "an ability to work." (R. 17.)

The ALJ placed little weight on the testimony of David Howland, Ms. Howland's husband. (*See* R. 18.) The ALJ also found that Ms. Howland's "statements concerning the intensity, persistence and limiting effects" of her symptoms were not credible to the extent they were "inconsistent with the [RFC] assessment." (R. 18.) Nevertheless, the ALJ gave Ms. Howland "some benefit of doubt" by including "greater restrictions" in the RFC determination. (R. 17.)

The ALJ ultimately agreed with the vocational expert's opinion and found that Ms. Howland could perform her past relevant work as a receptionist. (R. 17.) As such, the ALJ concluded that Ms. Howland was not disabled within the meaning of the Social Security Act at any time from September 1, 2005 through March 31, 2009, the date last insured. (R. 18.)

### III.    STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220

(1938)).  In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight.  *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision.  *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000) ("As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently."); *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Roberts v. Apfel*, 222 F.3d at 468.  Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record *de novo*. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

## IV.    CONCLUSIONS OF LAW

### A.  Applicable Law

Disability is defined as "the inability to do *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) (emphasis added). In making a disability determination, the

ALJ must utilize a sequential evaluation process that applies to both physical and mental disorders. Title 20, Section 404.1520, of the Code of Federal Regulations outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled. 20 C.F.R. § 404.1520.

The disability determination requires a step-by-step analysis. *See* 20 C.F.R. § 404.1520(a). At the first step, the ALJ must consider the claimant's work history. 20 C.F.R. § 404.1520(a)(4)(i). At the second step, the ALJ must consider the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). At the third step, the ALJ must consider whether the claimant has an impairment or impairments that meet or equal one of the listings in Appendix 1 to Subpart P of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 404.1520(d). If the claimant's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of the claimant's RFC and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant can still perform his or her past relevant work, the ALJ will find that the claimant is not disabled. *Id.* If the claimant cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

**B.  The ALJ Failed to Fully Develop the Medical Record In Assessing the Severity of Ms. Howland's MS Impairment.**

Ms. Howland first argues that the ALJ erred by failing to provide support as to whether her impairments met subparagraphs A and C of Listing 11.09. (ECF No. 7 at 4.) Listing 11.09 provides that multiple sclerosis, when accompanied by one of three other conditions, qualifies as a *per se* disability. 20 C.F.R. § 404, Subpt. P, App. 1, § 11.09. In step three of his analysis, the

ALJ made a conclusory statement that "[a]lthough the claimant's multiple sclerosis is a severe impairment, the record does not support a finding that it meets or equals the requirements of any section of the Listings of Impairment." (R. 15.) In fact, it appears that the ALJ did not engage in any specific analysis pursuant to Listing 11.09 with respect to Ms. Howland's MS impairment. (*See* R. 15-16.) The only listings referenced by the ALJ in his analysis were Listings 12.04 and 12.06, which pertain to mental impairments. (R. 15-16.)

It is well-settled that the "ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *See Scott v. Astrue*, 529 F.3d 818, 824 (8th Cir. 2008). In a case involving a degenerative disease such as MS, where a claimant does not have contemporaneous objective medical evidence of the onset of the disease, the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and diagnosis of her doctor. *See Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). Thus, the question before the court is whether the ALJ "consider[ed] evidence of a listed impairment and concluded that there was no showing on th[e] record that the claimant's impairments . . . meet or are equivalent to any of the listed impairments." *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006). Although "[t]he fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review," the record must support the ALJ's overall conclusions. *Id.*

In the instant case, the medical records show that treating practitioners acknowledged that Ms. Howland suffered some degree of MS-related impairment, particularly with respect to her motor function and fatigue on activity. Without a fully developed record, however, it is unclear whether Ms. Howland's MS symptoms satisfy the criteria of Listing 11.09A or 11.09C.

    **1.    The ALJ Failed to Assess the Severity of Ms. Howland's MS Impairment Under Listing 11.09A.**

Ms. Howland argues that the ALJ failed to provide any support as to why she did not meet the criteria of Listing 11.09A. (ECF No. 7 at 5.) Listing 11.09A provides that a claimant suffering from MS is presumptively disabled if she suffers "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. § 404, Subpt. P, App. 1, §§ 11.09A; 11.04B. Section 11.00C defines "persistent disorganization of motor function" as being "in the form of paresis or paralysis, tremor, or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations." 20 C.F.R. § 404, Subpt. P, App. 1, § 11.00. Section 11.00C also requires that "[t]he assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." *Id.*

Here, the administrative record was not developed to a sufficient degree to permit the ALJ to determine whether Ms. Howland suffers from such a "disorganization of motor function" as described in listing 11.09A. 20 C.F.R. § 404, Subpt. P, App. 1, § 11.09. Although Dr. Steiner concluded that Ms. Howland's impairments did not meet or equal any listings, Ms. Howland had been diagnosed with "weakness in her left upper extremity, particularly prominent in the hands grasps and finger strength," and "persistent problems with dysesthesias and discomfort in her lower extremities, up to calves, which has not changed over time." (R. 396, 399.) Ms. Howland's treating physician, Dr. Ingenito, also reported on a number of occasions that Ms. Howland suffered from "gait disturbance." (R. 257, 276, 429.) The medical record is silent, however, as to whether "the degree of interference with the use of fingers, hands, and arms" rose to the level of impairment required by listing 11.09A.

The ALJ has an affirmative duty to seek out information to fill any clear gaps in the administrative record, regardless of whether a claimant is represented by counsel. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citing *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983)). The ALJ, however, left a gap in the record as to whether Ms. Howland's MS impairments included "disorganization of motor function" under Listing 11.09A. The ALJ thus failed to develop the record in order to properly assess the severity of Ms. Howland's MS impairment under Listing 11.09A.

### 2. The ALJ Failed to Assess the Severity of Ms. Howland's MS Impairment Under Listing 11.09C.

Ms. Howland further argues that the ALJ also failed to provide any support as to why she did not meet the criteria of Listing 11.09C. (ECF No. 7 at 5.) Listing 11.09C provides criteria for evaluating the impairment of individuals who do not have muscle weakness or other significant disorganization of motor function at rest, but who do develop muscle weakness with activity as a result of fatigue. *See* 20 C.F.R. § 404, Subpt. P, App. 1, § 11.09. A claimant suffering from MS will be presumptively disabled under listing 11.09C if she suffers "[s]ignificant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." *Id.* Use of this criterion is "dependent upon (1) documenting a diagnosis of multiple sclerosis, (2) obtaining a description of fatigue considered to be characteristic of multiple sclerosis, and (3) obtaining evidence that the system has actually become fatigued." 20 C.F.R. § 404, Subpt. P, App. 1, § 11.00. "The evaluation of the magnitude of the impairment must consider the degree of exercise and the severity of the resulting muscle weakness." *Id.*

Here, the medical record contains contradicting opinions regarding Ms. Howland's fatigue on activity. On one hand, Ms. Howland testified that she is "so tired" and needs to lie down after exercising. (R. 392.) Her treating physician, Dr. Ingenito, also noted several times that "her leg and foot paresthesias are exacerbated by exercise." (R. 415.) In fact, Ms. Howland was diagnosed with "increased fatigue, generalized weakness and fatigability." (R. 392.) On the other hand, Dr. Steiner stated that there was "no actual measurement of fatigue … in the record," and concluded that Ms. Howland did not have the "reproducible fatigue of motor function" required under Listing 11.09C. (R. 35.)

Given the contradicting evidence in the record, the ALJ should have further developed the medical record to resolve the question of whether Ms. Howland's MS impairments met Listing 11.09C. *See Nevland*, 204 F.3d at 857. The ALJ, however, did not make any inquiry into "the degree of exercise" and "the severity of the resulting muscle weakness" in order to evaluate "the magnitude of the impairment" under Listing 11.09C. 20 C.F.R. § 404, Subpt. P, App. 1, § 11.00. Instead, the ALJ appeared to rely only on Dr. Steiner's testimony, despite the fact that Dr. Steiner did not even review the entire medical record, which included Dr. Ingenito's opinion that her symptoms were exacerbated by exercise. (R. 17, 415.) The ALJ did not sufficiently develop the record in order to determine whether Ms. Howland's fatigue on activity qualifies as "[s]ignificant, reproducible fatigue" and failed to address whether the severity of Ms. Howland's MS impairments satisfied Listing 11.09C.

### C. The ALJ's Determination of Ms. Howland's RFC Is Not Supported By Substantial Evidence In the Record as a Whole.

RFC "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," despite his or her physical or mental limitations. S.S.R. 96-8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996); *see* 20 C.F.R.

§ 404.1545(a). Objective evidence of subjective symptoms such as pain must be considered in assessing the extent of a claimant's RFC. See 20 C.F.R. § 404.1529(c), 416.929(c)(2). The ALJ bears primary responsibility for determining a claimant's RFC, and, because RFC is a medical question, some medical evidence must support the ALJ's determination of the claimant's RFC. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002).

1. **The ALJ Failed to Properly Evaluate and Weigh the Opinions of the Physician That Actually Treated and Examined Ms. Howland.**

In his RFC assessment, the ALJ gave significant weight to the opinion of the medical expert, Dr. Steiner, a physician who neither treated nor examined Ms. Howland. In fact, upon comparison of Dr. Steiner's testimony and the ALJ's findings, the ALJ seems to have relied solely on the testimony of Dr. Steiner in making his RFC determination. By contrast, the ALJ appears to have given little or no weight to the opinions of Dr. Ingenito, the physician who actually treated and examined Ms. Howland on a regular basis.

The opinion of a treating physician is accorded special deference under the social security regulations. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. *See* 20 C.F.R. § 404.1527(d)(2); *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004). The regulations provide that, the longer and more frequent the contact between the treating source, the greater the weight will be given to the opinion. *See* 20 C.F.R. § 404.1527(d)(2)(i); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). "When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." 20 C.F.R. § 404.1527(d)(2)(i). When the ALJ instead grants a treating physician's opinion little weight, the regulations provide that the ALJ must "always give

good reasons." 20 C.F.R. § 404.1527(d)(2). The Eighth Circuit has upheld the ALJ's discounting of the medical opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician issues inconsistent opinions that undermine the credibility of such opinions. *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996). In addition, "the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Shontos*, 328 F.3d at 427. An ALJ may nevertheless credit medical evaluations of a consulting physician over that of the treating physician when such other assessments "are supported by better or more thorough medical evidence." *Rogers*, 118 F.3d at 602.

Here, the ALJ gave "significant weight" to Dr. Steiner's opinion because it was purportedly "consistent with the record as a whole," while the ALJ appeared to give little to no weight to Dr. Ingenito's opinions without explanation. (R. 16-17.) Contrary to the ALJ's finding, Dr. Steiner's opinion is not consistent with the record as a whole. At the administrative hearing, Dr. Steiner testified that the medical record did not document "problems with upper extremity use as far as fine manipulation or firm gripping." (R. 36.) Still, the treatment records contain potentially contradictory evidence documented by Dr. Ingenito on September 18, 2008 and October 28, 2008: a diagnosis of weakness in Ms. Howland's left upper extremity, particularly prominent in the hands grasps and finger strength. (R. 396, 399.) Moreover, the record reveals that Dr. Steiner's opinions are neither "thorough" nor "supported by better medical evidence." *See Rogers*, 118 F.3d at 602. Dr. Steiner admitted that he "didn't have sufficient time to review the entire [sic] of exhibit 17" (Ms. Howland's medical record dated November 16, 2006 to December 30, 2008), yet relied on other portions of the record in forming his opinion. (R. 36.)

Moreover, Dr. Steiner conceded that "the most notably recapitulated" symptoms of numbness, weakness and fatigue were evidenced in Exhibit 17, the documents he failed to review in their entirety. (R. 35.) Because Dr. Steiner based his opinion on only a partial review of the medical records, the ALJ erred in giving his testimony controlling weight.

The ALJ also failed to properly consider and evaluate the reports of Dr. Ingenito, the physician who actually treated and examined Ms. Howland on a regular basis for a number of years. Between October 2004 and December 2008, Ms. Howland sought neurological treatment from Ingenito fourteen times, including once on an emergent basis and another time on a "semi-emergent" basis. (R. 404, 440.) In fact, Dr. Ingenito is the only physician who treated Ms. Howland's MS. Given the length of the treatment relationship and the frequency of examination, Dr. Ingenito's opinion provides the "longitudinal picture" of Ms. Howland's neurological impairments. 20 C.F.R. § 404.1527(d)(2)(i). Thus, Dr. Ingenito's opinions should be entitled to greater weight than those of Dr. Steiner. *See id.*; *Hatcher v. Barnhart*, 368 F.3d 1045-47 (8th Cir. 2004) (citing the "numerous visits" [the claimant] had with the treating doctor and "his experience with treating her chronic pain" in finding that the ALJ's discounting of the treating physician's opinion was improper).

Dr. Ingenito's reports, however, were mentioned nowhere in the ALJ's decision. Even if the ALJ were to discount Dr. Ingenito's evaluations, the ALJ failed to make any findings or point to any inconsistencies within Dr. Ingenito's extensive medical reports that may have detracted from their weight. *See Cruze*, 85 F.3d at 1325 (according a treating physician's opinion less deference where the treating physician offered inconsistent opinions). Nor did he find that Dr. Ingenito's opinions were "vague or conclusive." *See Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (finding the treating physician's vague and conclusory opinion is not entitled to

deference). Without articulating any "good reason" why Dr. Ingenito's opinions should not be given controlling weight, the ALJ departed from the requirement that a treating physician's opinion be afforded special deference. *See* 20 C.F.R. § 404.1527(d)(2).

In sum, the ALJ failed to properly evaluate and weigh the opinions of Dr. Ingenito who actually treated and examined Ms. Howland. Because "the opinion of a consulting physician who examined a claimant once or not all does not generally constitute substantial evidence," the ALJ's findings, which rely solely on Dr. Steiner's opinion, are not supported by substantial evidence in the record. *See Kelley*, 133 F.3d at 589.

### 2. The ALJ Failed to Properly Assess Ms. Howland's Ability to Function Under the Stress of Employment.

In contesting the ALJ's RFC assessment, Ms. Howland also argues that the ALJ failed to properly consider whether she could handle the pace and persistence of competitive employment. (ECF No. 7 at 10.) RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. Social Security Ruling 96-8p, 61 Fed. Reg. 34474 (July 2, 1996). A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule." *Id.*

Dr. Rafferty's report concluded that Ms. Howland had a short-term attention span, poor memory skills, and difficulties with carrying out tasks with reasonable persistence and pace. (R. 300-01.) Dr. Rafferty also opined that Ms. Howland "could not manage the stress of employment." (R. 301.) The ALJ discounted Dr. Rafferty's opinion, finding it to be "contradicted by the record." (R. 17.) Specifically, the ALJ found that Ms. Howland has "engaged in some work activity," and thus "been exposed to the stress of employment since her alleged onset date." (R. 17.)

Since her alleged onset date of September 1, 2005, however, Ms. Howland has not been exposed to the stress of full-time employment as contemplated by the regulation. Her child care assistant work lasted only "three and half hours a day, five days a week." (R. 27.) Ms. Howland ultimately quit this part-time job in March 2006 due to the "continued exacerbations" of her MS symptoms. (R. 27.) She testified that she was missing so much work that replacements had to be found for her "all the time." (R. 27.) Because RFC depends on the ability to perform "the requisite physical acts day in and day out," the ALJ improperly relied on Ms. Howland's part-time work history to discredit Dr. Rafferty's opinion. *See Ingram v. Charter*, 107 F.3d 598, 604 (8th Cir. 1997).

Dr. Ingenito's treatment records also suggests that Ms. Howland had difficulty coping with the stress of employment. Dr. Ingenito noted that Ms. Howland's MS symptom exacerbations improved only after she stopped working in March 2006. (R. 280.) Dr. Ingenito also noted several times in his reports that Ms. Howland has a history of anxiety and depression. (R. 272 ("Xanax p.r.n. is very helpful in relieving her anxiety, but she has not needed it since quitting work.")) Additionally, Dr. Ingenito noticed a correlation between Ms. Howland's MS symptom exacerbations and her stress level. (R. 397 ("Exacerbations of MS and worsening symptoms have often been triggered by stress.")) On August 11, 2006, Dr. Ingenito prescribed Cymbalta for treatment of Ms. Howland's stress. (R. 408, 411.) Despite the "moderate improvement" in her depression symptoms, Ms. Howland continued to experience significant anxiety. (R. 399.) Dr. Ingenito noted that these symptoms were exacerbated by stress related to her mother's illness. (R. 399.) The correlation between Ms. Howland's MS exacerbations and her mental condition lend further support for the conclusion that Ms. Howland is unable to manage the stress of employment.

The ALJ bears the responsibility to "obtain medical evidence that addresses [Ms. Howland's] ability to function in the workplace." *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010). The ALJ, however, discredited Dr. Rafferty's opinion that Ms. Howland was unable to function under the stress of employment without additional medical evidence to the contrary.

### 3.    The ALJ Did Not Properly Assess Ms. Howland's Credibility.

Lastly, Ms. Howland argues that the ALJ did not properly consider her subjective complaints in determining her RFC and failed to properly assess her credibility. (ECF No. 7 at 11, 13.) When assessing the credibility of a claimant's subjective allegations of pain, the ALJ must consider the claimant's prior work history, daily activities, duration, frequency and intensity of pain, dosage, effectiveness and side effects of medication, precipitating and aggravating factors, and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). A claimant's "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." Soc. Sec. Ruling 96-7p, 1996 SSR LEXIS 4 (July 2, 1996). A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. §§ 404.1529, 416.929; *McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In rejecting a claimant's complaints of pain as not credible, an ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003). An ALJ's credibility finding will be upheld as long as the "ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001) (quoting *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990)).

Here, in assessing the credibility of Ms. Howland's subjective complaints, the ALJ hinged his finding on his RFC determination. (R. 18 ("The claimant's statements concerning the intensity, persistence and limiting effects of [her MS] symptoms are not credible to the extent they are inconsistent with the [RFC] assessment.").) It is for the purpose of determining RFC, however, that an ALJ must evaluate a claimant's credibility, and take into account all relevant evidence. *See* 20 C.F.R. §§ 404.1545. Thus, the ALJ should have considered Ms. Howland's credibility as one factor in determining her RFC, rather than substituting his subjective RFC determination for a credibility assessment. By basing the credibility assessment on his RFC determination, the ALJ not only failed to conduct a valid credibility assessment, but also compromised his RFC determination.

Furthermore, the ALJ failed to consider all of the evidence in relation to Ms. Howland's subjective complaints. While there is evidence in the record concerning duration, frequency and intensity of pain, precipitating and aggravating factors, and functional restrictions, these factors are not elaborated in the ALJ's decision as required by *Polaski*. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In fact, despite concluding that Ms. Howland's subjective complaints were inconsistent with her RFC, the ALJ found Ms. Howland's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (R. 18.) The ALJ must do more than make a "cursory reference" to the *Polaski* factors when examining the evidence relating to alleged intensity, persistence and limiting effects of a claimant's impairments. *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir. 1991). It is not enough that inconsistencies may exist; the ALJ must set forth the inconsistencies in the evidence presented when making his determination of a claimant's credibility. *Herbert v. Heckler*, 783 F.2d 128, 131 (8th Cir. 1986).

For all of the foregoing reasons, the ALJ's conclusion that Ms. Howland is not disabled is not supported by substantial evidence in the record as a whole. On remand, the ALJ must analyze the severity of Ms. Howland's MS impairments under Listing 11.09A and 11.09C. If the ALJ finds that Ms. Howland's MS does not satisfy the 11.09 MS Listings, the ALJ must conduct a valid RFC assessment, taking into account Ms. Howland's ability to function under the stress of employment. He must also conduct a complete and proper credibility evaluation of her subjective complaints pursuant to *Polaski* and Social Security Ruling 96-7p. *See Dornbusch v. Astrue*, 2010 WL 3842380 at *7 (D. Minn. Sept. 27, 2010) ("The ALJ cannot dismiss [the claimant's] complaints of *subjective* symptoms solely on the ground that they are not supported by *objective* medical evidence. Instead, the ALJ must give full consideration to all of the evidence presented relating to [the claimant's] subjective symptoms, and the ALJ must carefully and clearly analyze each of the factors identified by *Polaski* and Social Security Ruling 96-7p.") The ALJ must further develop the record in order to make all of the aforementioned determinations.

## V.    RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant's Motion for Summary Judgment (ECF No. 9) be **DENIED**; and

2.    Plaintiff's Motion for Summary Judgment (ECF No. 6) be **GRANTED, in part, and DENIED, in part,** as follows:

   a.    The decision of Administrative Law Judge William G. Brown dated April 23, 2009 be **REVERSED**.

   b.    This matter be **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion.

      c.        The motion be **DENIED** in all other respects.


DATED:  January 14, 2011                  *s/ Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before January 31, 2011, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.